# EXHIBIT C

## IN THE CIRCUIT COURT OF THE FIFTEENTH JUDICIAL CIRCUIT,
## IN AND FOR PALM BEACH COUNTY, FLORIDA

KRUNCHCASH, LLC,

      Plaintiffs,

v.                               CASE NO:

DIANE N. RESNICK, individually, PERRY A.
RESNICK, individually, JONATHAN S.
RESNICK, individually, LAW OFFICE OF
PERRY A. RESNICK, ESQUIRE, LLC, a
Maryland limited liability company, THE
LAW OFFICE OF JONATHAN S. RESNICK,
PLLC, a Washington D.C., professional limited
liability company, THE LAW OFFICE OF
JONATHAN S. RESNICK, LLC, a Maryland
limited liability company, and JOHN DOE
DEFENDANTS,

      Defendants.

_____/

## COMPLAINT

      Plaintiffs, KRUNCHCASH, LLC ("Plaintiff"), sues Defendants, DIANE N. RESNICK,

("Diane"), PERRY A. RESNICK ("Perry"), JONATHAN S. RESNICK ("Jonathan"), THE

LAW OFFICE OF JONATHAN S. RESNICK, PLLC ("Jonathan DC Firm"), THE LAW

OFFICE OF JONATHAN S. RESNICK, LLC ("Jonathan Maryland Firm"), LAW OFFICE OF

PERRY A. RESNICK, ESQUIRE, LLC ("Perry Firm"), and JOHN DOE DEFENDANTS

(collectively, "Defendants"), and allege:

## I. INTRODUCTION

      1.    This is an action to recover a minimum of $13.1 million due and owing to

Plaintiff, a funding company, from the Resnicks' personal injury law firms, their owners Perry

and Jonathan, and Jonathan's spouse Diane. Perry and Jonathan both signed *Guaranty*

*Agreements* obligating themselves jointly and severally for the other's debts to Plaintiff.  In other words, both Perry and Jonathan, individually, are on the hook for the $13.1 million owed to Plaintiff.

2.      On June 20, 2019, the Resnicks breached their various agreements by defaulting on their repayment obligations to Plaintiff, converting all case proceeds for their own benefit to Plaintiff's detriment, and shutting Plaintiff out of the businesses entirely.  Adding insult to injury, Perry and Jonathan then fraudulently transferred their law firms' phone number, office location, business operations, assets, and clients to another entity – the John Doe Defendants, believed to include the Law Office of Louis J. Glick – in a brazen attempt to defraud Plaintiff and make themselves judgment proof.  Defendants have since failed to repay one penny of the minimum $13.1 million in outstanding debt since June 20, 2019.  Plaintiff now brings this action to remedy the damage caused by Defendants' unscrupulous scheme.

## II.  JURISDICTION, VENUE & PARTIES

3.      Plaintiff is a Florida limited liability company with its principal place of business in Palm Beach County, Florida.

4.      Defendant Diane is an adult individual residing in Palm Beach County, Florida. Diane is Jonathan's wife and Perry's mother.

5.      Defendant Perry Firm is a Maryland personal injury law firm with its principal place of business in Baltimore, Maryland.

6.      Defendant Perry is an adult individual residing in Palm Beach County, Florida. At all relevant times, Perry was the owner and managing member of the Perry Firm.  Perry and the Perry Firm shall be referred to collectively as the "Perry Parties."

7.      Defendant Jonathan Maryland Firm is a Maryland personal injury law firm with its principal place of business in Pikesville, Maryland.

8.      Defendant Jonathan DC Firm is a Washington, D.C. personal injury law firm with its principal place of business in Pikesville, Maryland.  The Jonathan DC Firm and Jonathan Maryland Firm shall be referred to collectively as the "Jonathan Firms."

9.      Defendant Jonathan is an adult individual residing in Palm Beach County, Florida. At all relevant times, Jonathan was the owner and managing member of both Jonathan Firms.  Jonathan and the Jonathan Firms shall be referred to collectively as the "Jonathan Parties."  The Jonathan Parties and Perry Parties shall be referred to collectively as the "Resnicks."

10.     The John Doe Defendants are Maryland law firm(s) and/or attorneys that now operate the Perry Firm and Jonathan Firms, including representing their clients and collecting the settlement proceeds – portions of which are owed to Plaintiff.  Upon information and belief, the John Doe Defendants include the Law Office of Louis J. Glick, a Maryland law firm operating out of the same Maryland office location as the Jonathan Firms.  As further alleged below, the John Doe Defendants are the mere continuation of, and successor-in-interest to, the Perry Firm and Jonathan Firms.

11.     Defendants transact substantial and not isolated business in Palm Beach County, Florida, including but not limited to contracting with Plaintiff in the State of Florida, making contractual payments to Plaintiff in Palm Beach County, FL, and owing contractual payments to Plaintiff in Palm Beach County, Florida.

12.     Venue is proper in the Circuit Court in Palm Beach County, Florida because the amount in dispute exceeds $15,000.00, exclusive of interest, costs, and attorney's fees; Plaintiff

3

resides in Palm Beach County; Defendants Diane, Perry, and Jonathan reside in Palm Beach County; the causes of action accrued in Palm Beach County; and the parties contractually-agreed to resolve all disputes arising under of their contracts in Palm Beach County.  [*See* Jonathan Firms' Funding Agreements attached hereto.]

### III.  FACTUAL ALLEGATIONS

13.     Plaintiff is in the business of funding various companies and, since 2007, has been being doing business with Jonathan and his personal injury law firm.  To further their business interests, Plaintiff and the Resnicks entered into the following contracts governing their relationship.

**A.      Diane and the Jonathan Parties' Funding Agreements with Plaintiff**

Secured Promissory Note

14.     In 2011, Jonathan's ex-law partner sued him for stealing money from their then-law firm.  The case ultimately settled with the firm, Jonathan & Diane guaranteeing repayment of $1.2 million to the ex-law partner in bi-weekly payments.  When they could no longer make the bi-weekly payments obligations, Jonathan approached Plaintiff for a loan to payoff the debt. In October 2014, Plaintiff agreed to bailout Jonathan and his wife giving the Jonathan Maryland Firm, Jonathan & Diane a loan, guaranteed by all, to pay off the ex-law partner.

15.     Specifically, from October 24, 2014, through August 23, 2015, Plaintiff loaned to Jonathan and the Jonathan Maryland Firm the total amount of $600,000 (the "Loan"), memorialized by the following duly-executed contracts:

     a.   *Secured Promissory Note*, dated October 24, 2014 for $395,000;

     b.   *Amendment No. 1 to Secured Promissory Note*, dated August 23, 2015, to reflect the increase of the Loan principal amount to $600,000; and

     c. *Security Agreement* and *Amendment No. 1 to Security Agreement* to secure payment of the Loan.

16.    On or about March 16, 2016, Plaintiff and the Jonathan Parties executed an *Amendment No. 2 to Secured Promissory Note* (the "Secured Note"), that reduced the loan principal owed to $327,000, changed the maturity date to no later than April 1, 2017, and added Jonathan DC Firm as a party. [Copies of the entire *Secured Note*, as amended, and the Security Agreement, as amended, are attached hereto as **Exhibits A and B**, respectively.]

17.    The Secured Note also required Jonathan to take out a Life Insurance Policy for no less than $500,000 in coverage, with Plaintiff as the sole beneficiary. [Ex. A at § 8.6.]

18.    Diane, Jonathan's wife, joined in the Secured Note and Security Agreements, agreed to be legally bound by their terms and conditions, and jointly and severally guaranteed all obligations of Jonathan and the Jonathan Firms in both Agreements. [*See* Exs. A and B.]

19.    Further, the *Secured Note* is secured by, among other things, the following Collateral owned by Diane, Jonathan or the Jonathan Maryland Firm:

    a. All personal property, including accounts receivable, promissory notes, securities, investment properties, money, deposit accounts and other contractual rights or rights to payment of monies;

    b. All real property;

    c. All motor vehicles;

    d. all income, fees, claims, disbursements and payments now or hereafter due;

    e. all proceeds from Jonathan's life insurance policy required under the *Secured Note*; and

    f. any other personal property owned by Diane and/or Jonathan.

[Ex. B at § 2.]

20.     On November 12, 2014, Plaintiff perfected its security interest in the above collateral by filing a UCC Financing Statement with the State of Florida.  [A copy of the UCC Financing Statement is attached hereto as **Exhibit C**.]

Main Funding Agreement

21.     On or about June 1, 2016, Plaintiff and the Jonathan Firms executed a *Law Firm Funding Agreement* (the "Main Funding Agreement"), whereby Plaintiff agreed to provide certain cash advances to the Jonathan Firms for certain cases in the Jonathan Firms' caseload inventory.  [A copy of the *Main Funding Agreement* is attached hereto as **Exhibit D**.]

22.     In exchange for the cash advances under the *Main Funding Agreement*, the Jonathan Firms agreed to repay Plaintiff, among other things, the following amounts:

   a.  A monthly use fee of 4% per month for each cash advance, running from the date of the cash advance until Plaintiff receives repayment in full.  [*Id*. at § 1(B).]

   b.  For Pre-Settlement Funding, the cash advance amount plus a monthly use fee of 4% per month (with a minimum 6 months' use fee), payable upon receipt of proceeds or disposition of the case, for each Funded Case.  [*Id*. at § 1(C)(i).]

   c.  For Post-Settlement Funding and Settlement Acceleration Funding, the cash advance amount plus a monthly use fee of 4% per month (with a minimum 2 months' use fee), payable no later than 3 months from the date of the advance, for each Funded Case.  [*Id*. at § 1(C)(iii)-(iv).]

23.     Should any Funded Case proceed to litigation, be closed, or no longer remain with the Jonathan Firms, the Jonathan Firms agreed to immediately pay to Plaintiff all Pre-Settlement Funding amounts, including the accumulated use fee, for said Funded Case.  [*Id*. at § 1(C)(ii).]

24.     Importantly, the Jonathan Firms' obligations in the *Main Funding Agreement* are secured by, among other things, the following Collateral (as defined in the *Main Funding Agreement*):

    a.  The Jonathan Firms' personal property, including accounts receivable, promissory notes, securities, investment properties, money, deposit accounts and other contractual rights or rights to payment of monies;

    b.  all income, fees, claims, disbursements and payments now or hereafter due or payable to the Jonathan Firms; and

    c.  any other asset of the Jonathan Firms.

[*Id*. at § 2.]

25.    The Jonathan Firms also agreed to the following:

    a.  To not sell, pledge, transfer, or encumber any of the Collateral.  [*Id*. at § 3(a).]

    b.  To notify Plaintiff if it changed law firms or attorneys managing for any Funded Case or if it received any proceeds from a Funded Case.  [*Id*. at § 3(b).]

26.    The *Main Funding Agreement* also allowed Plaintiff to accelerate all amounts due to Plaintiff, including the cash advance amount and accumulated use fee regardless of the outcome of the Funded Cases, should the Jonathan Firms default on any obligation contained therein.  [*Id*. at § 4.]

<u>General Expense and Medical Expense Funding Agreements</u>

27.    In 2018, the Jonathan DC Firm needed extra funding to serve its personal injury clients and manage its caseload appropriately.

28.    On or about March 26, 2018, and May 11, 2018, Plaintiff and the Jonathan DC Firm executed a *Law Firm General Expense Funding Agreement* (the "General Expense Agreement") and a *Law Firm Medical Expense Funding Agreement* (the "Medical Expense Agreement"), respectively. [Copies of the *General Expense Agreement* and *Medical Expense Agreement* are attached hereto as **Exhibits E and F**; the *Main Funding Agreement*, *General Expense Agreement* and *Medical Expense Agreement* shall be collective referred to as the "Jonathan Funding Agreements."]

29.     Pursuant to the *General Expense Agreement* and *Medical Expense Agreement*, Plaintiff agreed to provide additional cash advances for general expenses and medical expenses, respectively, incurred in certain personal injury cases handled by the Jonathan DC Firm.

30.     In exchange, the Jonathan DC Firm agreed to repay Plaintiff the cash advance amount plus a 4% monthly use fee, with a minimum of 6 months required, payable upon the earlier of the receipt of proceeds from each Funded Case or eighteen months from the date of the advance.  [Exs. E and F § 1(a)-(d)(i).]

31.     Similar to the *Main Funding Agreement*, the *General Expense* and *Medical Expense Agreements* also included the following protections for Plaintiff:

   a.   Granting a security interest to Plaintiff in all case proceeds payable to the Jonathan DC Firm ("Collateral"). [*Id*. at § 3.]

   b.   Prohibiting Jonathan DC Firm from selling, pledging, transferring, or encumbering any of the Collateral without Plaintiff's consent.  [*Id*. at § 4(a).]

   c.   Requiring Jonathan DC Firm to notify Plaintiff of a change in law firms/managing attorney for any Funded case, along with notification when the Funded Case is completed and/or receipt of proceeds.  [*Id*. at § 4(b).]

32.     As with the *Main Funding Agreement*, the *General Expense* and *Medical Expense Agreements* also allowed Plaintiff to accelerate all amounts due to Plaintiff, including the cash advance amount and accumulated use fee regardless of the outcome of the Funded Cases, should the Jonathan DC Firm default on any obligation contained in either Agreement.  [*Id*. at § 4.]

**B.     The Perry Parties' Funding Agreement with Plaintiff**

33.     On or about September 10, 2018, Plaintiff, Perry individually, and the Perry Firm executed a *Law Firm Funding Agreement* (the "Perry Funding Agreement"), whereby Plaintiff agreed to provide certain cash advances to the Perry Firm for certain cases in the Perry Firm's caseload inventory.  [A copy of the *Perry Funding Agreement* is attached hereto as **Exhibit G**.]

34.    In exchange for the cash advances under this Agreement, the Perry Firm agreed to repay Plaintiff, among other things, the following amounts:

a.  A monthly use fee of 4% per month for each cash advance, running from the date of the cash advance until Plaintiff receives repayment in full.  [*Id*. at § 1(B).]

b.  For Pre-Settlement Funding, the cash advance amount plus a monthly use fee of 4% per month (with a minimum 6 months' use fee), payable upon receipt of proceeds or disposition of the case, for each Funded Case.  [*Id*. at § 1(C)(i).]

c.  For Post-Settlement Funding and Settlement Acceleration Funding, the cash advance amount plus a monthly use fee of 4% per month (with a minimum 2 months' use fee), payable no later than 3 months from the date of the advance, for each Funded Case.  [*Id*. at § 1(C)(iii)-(iv).]

35.    Should any Funded Case proceed to litigation, be closed, or no longer remain with the Perry Firm, the Perry Firm agreed to immediately pay to Plaintiff all Pre-Settlement Funding amounts for said Funded Case.  [*Id*. at § 1(C)(ii).]

36.    Importantly, the Perry Firm's obligations in the *Perry Funding Agreement* are secured by, among other things, the following Collateral (as defined in the Agreement):

a.  The Perry Firm's personal property, including accounts receivable, promissory notes, securities, investment properties, money, deposit accounts and other contractual rights or rights to payment of monies;

b.  all income, fees, claims, disbursements and payments now or hereafter due or payable to the Perry Firm; and

c.  any other asset of the Perry Firm.

[*Id*. at § 2.]

37.    The Perry Firm also agreed to the following:

a.  To not sell, pledge, transfer, or encumber any of the Collateral.  [*Id*. at § 3(a).]

b.  To notify Plaintiff if it changed law firms or attorneys managing for any Funded Case or if it received any proceeds from a Funded Case.  [*Id*. at § 3(b).]

38.     The *Perry Funding Agreement* also allowed Plaintiff to accelerate all amounts due to Plaintiff, including the cash advance amount and accumulated use fee regardless of the outcome of the Funded Cases, should the Perry Firm default on any obligation contained therein.  [*Id*. at § 4.]

39.     Notably, Perry joined the *Perry Funding Agreement*, and personally guaranteed any and all payment obligations owed to Plaintiff under this contract.  [*Id*. at p. 9.]

**C.     The Guaranty Agreements with Plaintiff**

40.     On Friday night, March 29, 2019, Plaintiff received a call from the Resnicks' marketing firm stating they were not paid for the week (3.25.19 to 3.31.19) and asking if Plaintiff funded the Rensnicks' firms that week (which Plaintiff had).

41.     Over the weekend, Plaintiff's principal met with Jonathan in Boca Raton only to discover that the Jonathan Firms and the Perry Firm had breached their respective Funding Agreements by encumbering Plaintiff's Collateral (as defined in the respective Agreements) with additional third-party loans to the firms, without Plaintiff's knowledge or consent.  Specifically, Jonathan admitted to Plaintiff that the Resnicks encumbered their Firms with approximately $800,000 in additional third party loans from loan sharks, merchant cash advances, and others, and that Jonathan was skimming money from Plaintiff's daily funding advances meant to pay the marketing firm (who now allege an unsecured debt of $320,000).

42.     During this late-March 2019 weekend meeting, Jonathan begged Plaintiff for financial help, especially to pay off two loan sharks, among others, that had threatened him and his family with bodily harm if repayment was not received immediately.  Jonathan provided Plaintiff a list of these third-party loans, along with some supporting loan documents.  One of the

loan holders threatening the Resnicks had a loan agreement with the Perry Parties whereby the Perry Firm pledged its IOTA account as collateral.

43.     To protect the Resnicks from bodily harm and to protect Plaintiff's investment in their firms, Plaintiff immediately provided the Resnicks $160,000 to pay off the loan sharks and merchant cash advances.  The Resnicks agreed this money was a loan to be repaid on demand.

44.     Additionally, at the late-March 2019 weekend, Jonathan also pleaded to Plaintiff to help the Jonathan Firms and Perry Firm "administratively only" because Jonathan and Perry were not currently capable.  To help out his long-time colleague and to protect its investment in the firms, Plaintiff agreed to help "administratively only" beginning on April 15, 2019.

45.     Instead of exercising its contractual right to terminate the various Funding Agreements because of these breaches, Plaintiff required additional consideration in exchange for continuing to fund the law firms under their respective Funding Agreements.

46.     To that end, on or about April 15, 2019, the Jonathan Parties and Perry Parties both executed separate *Guaranty and Security Agreements* (the "Guaranty Agreements") with Plaintiff, whereby the Perry Parties also agreed to be responsible for the Jonathan Parties' contractual payment obligations to Plaintiff, and vice versa.  [Copies of Perry and Jonathan's *Guaranty Agreements* are attached hereto as **Exhibits H and I**, respectively.]

47.     In other words, the Perry Parties, including Perry individually, are not only responsible for all debts and obligations owed to Plaintiff under the *Perry Funding Agreement*, but also all debts and obligations owed to Plaintiff under the *Jonathan Funding Agreements*. [*See Guaranty Agreements* §§ 3(a), 5(a), and 16(f).]

48.    Likewise, the Jonathan Parties, including Jonathan individually, are now responsible for all debts and obligations owed to Plaintiff under the *Perry Funding Agreement*, in addition to his own contractual obligations under the *Jonathan Funding Agreements*.  [*See id*.]

**D.    Diane and the Resnicks Breach Their Agreements**

49.    As of filing the instant suit, Plaintiff has provided over $7 million in outstanding, mutually-agreed cash advances, for over 3000 cases, pursuant to the terms of the parties' *Secured Note*, *Jonathan Funding Agreements* and *Perry Funding Agreement*.   Unfortunately, the Resnicks are in default of each and every Agreement as set forth below.

50.    Diane and the Jonathan Parties are in default of the *Secured Note* for:

a.   failing to pay the remaining $50,000 balance on or before the due date, or any date thereafter; and

b.   failing to take out a life insurance policy on Jonathan's life, with Plaintiff as sole beneficiary, for $500,000 in coverage or more.

51.    The Perry Parties are in default of the *Perry Funding Agreement* for:

a.   failing to pay Pre-Settlement advances, plus accumulated use fee, upon receipt of proceeds on Funded Cases;

b.   placing approximately 300+ cases into ligation, and closing out approximately 120+ cases, without repaying the Pre-Settlement advances, plus accumulated use fee; and

c.   failing to pay approximately $70,697 in Post-Settlement Funding that came due upon receipt of proceeds for those Funded Cases.

52.    Likewise, the Jonathan Firms are in default of the *Main Funding Agreement* for:

a.   failing to pay Pre-Settlement advances, plus accumulated use fee, upon receipt of proceeds on Funded Cases;

12

    b.  placing approximately 980+ cases into ligation, and closing out approximately 1190+ cases, without repaying the Pre-Settlement advances, plus accumulated use fee; and

    c.  failing to pay approximately $14,147 in Post-Settlement Funding that came due upon receipt of proceeds for those Funded Cases.

53.    As of June 1, 2019, the Jonathan DC Firm is in default of the *General Expense Agreement* for failing to pay approximately $102,000 in cash advances and accumulated use fees from proceeds received in Funded Cases under that Agreement.

54.    Similarly, as of June 1, 2019, the Jonathan DC Firm is in default of the *Medical Expense Agreement* for failing to pay approximately $91,000 in cash advances and accumulated use fees from proceeds received in Funded Cases under that Agreement.

55.    Any of the breaches of the various *Funding Agreements* listed in Pars. 40-41, 51-54, and 63-65 entitle Plaintiff to accelerate all cash advances due, plus all use fees due.  As of filing, the minimum, total accelerated amounts owed to Plaintiff are as follows:

| | Advances | Use Fee | Total |
|---|---|---|---|
| Main Funding Agreement | $2,600,216 | $1,518,648 | $4,118,864 |
| General Expense Agreement | $1,178,124 | $208,188 | $1,386,312 |
| Medical Expense Agreement | $1,178,124 | $211,680 | $1,389,804 |
| Perry Funding Agreement | $2,167,520 | $66,760 | $2,234,280 |
| | **$7,123,984** | **$2,005,276** | **$9,129,260** |

56.    Pursuant to the *Guaranty Agreements*, Perry and Jonathan, individually, along with their law firms, are all legally responsible, jointly and severally, for the $9.129 million owed to Plaintiff.

E.    **Plaintiff's Funding of the Jonathan Firms and Perry Firm's General Operations.**

57.    Since 2013, in addition to the various Funding Agreements, Plaintiff also advanced funding, plus use fee, to the Jonathan Firms and Perry Firm to cover shortfalls in their general operations, including advancing approximately $2.808 million in employee payroll and $515,000 in health insurance.   Plaintiff also funded the Jonathan Firms and Perry Firm's technology systems, including Dropbox, Google Suite, Microsoft Office 365, and Box.

58.    To date, the Jonathan Firms and Perry Firm repaid $68,084 to Plaintiff for payroll reimbursements.   On June 21, 2019, the Perry Firm wrote Plaintiff two checks – for $32,100 and $20,283 –to reimburse Plaintiff for payroll made, but both were returned for insufficient funds. Prior to the checks clearing, upon information and belief, Jonathan emptied the Perry Firm bank account to avoid repaying Plaintiff.   The unpaid payroll balance is $2.740 million.

59.    Per the agreement between the parties, these monies advanced for general operations were loans payable on demand.

E.    **The Jonathan Firms and Perry Firm Transferred Their Business to the John Doe Defendants.**

60.    From April 15, 2019 until June 20, 2019, Plaintiff assisted the Jonathan Firms and Perry Firm administratively to help keep the firms up and running.

61.    Shortly thereafter, despite the repeated bailouts over the years and $13 million+ advanced, the Resnicks "repaid" Plaintiff by locking Plaintiff out of from having visible access to their law firms' information and communication with staff, starting when Plaintiff began questioning the Resnicks' financial improprieties and demanding the monies owed.

62.    Further, in June 2019, Perry took a leave of absence from the Perry Firm for health reasons and, in July 2019, ultimately closed the Perry Firm office indefinitely.

63.     In a thinly-veiled attempt to fraudulently avoid their payment obligations to Plaintiff, upon information and belief, it appears that the Resnicks pre-emptively shut down the operations for both law firms and funneled their business, clients, some of the employees, and assets to the John Doe Defendants – fellow Maryland personal injury law firm(s) and/or attorneys that Jonathan owns, controls, or has contractual relationships with.

64.     In particular, the John Doe Defendants likely include the Law Office of Louis J. Glick, a Maryland law firm operating out of the same Maryland office location as the Jonathan Firms once did.  Jonathan also now works at the Law Office of Louis J. Glick, and the Jonathan Firms' main office phone number – 410-484-9600 – now rings into the Law Office of Louis J. Glick.

65.     By making these transfers, the Jonathan Firms and Perry Firm not only breached their respective Funding Agreements, but also deprived Plaintiff of its rights to receive repayment from case proceeds or pursue claims for unpaid case proceeds against their firms. Indeed, all profits from the Jonathan Firms and Perry Firm are, upon information and belief, now under the John Doe Defendants' umbrella.

66.     Indeed, the John Doe Defendants now perform the identical, legal services that the Resnicks performed – *i.e.*, representing personal injury clients against insurance companies, for the same clients that the Resnicks serviced, at the same office location that the Resnicks used in Pikesville, Maryland.

67.     The Resnicks' transfer of their law firms' assets, clients, employees, and its entire business operations to John Doe Defendants, for little to no consideration, left the Jonathan Firms and Perry Firm as shell companies and John Doe Defendants as the alter ego or mere

continuation of those firms.  This continuation of Jonathan Firms and Perry Firm's businesses by John Doe Defendants is evident because, among other things:

- Upon information and belief, the Jonathan Firms and Perry Firm, on one hand, and John Doe Defendants, on the other hand, are both owned, controlled and/or managed by the same individual – Jonathan.

- John Doe Defendants provide identical legal services as the Jonathan Firms and Perry Firm did at the same office location with the same office phone number;

- The Jonathan Firms and Perry Firm mysteriously ceased operations after Plaintiff began questioning financial improprieties in the Firms;

- The Jonathan Firms and Perry Firm "former" clients and some of their employees are now clients and employees of John Doe Defendants.

68.     Such actions constitute a "de facto merger" or "mere continuation" scheme between the Jonathan Firms and Perry Firm, on one hand, and John Doe Defendants, on the other hand, that renders John Doe Defendants liable, as successor, for the debts of its predecessor, the Jonathan Firms and Perry Firm.

69.     All conditions precedent to the filing of this action have been performed or waived.

70.     Plaintiff has retained the undersigned firm and are obligated to pay reasonable attorney's fees to such firm.

## COUNT I
### Breach of Secured Note
**(against Diane and the Jonathan Parties)**

71.     Plaintiff repeats and realleges paragraphs 1 through 70 above as if fully set forth herein.

72.     On or about March 16, 2016, Plaintiff, Diane, and the Jonathan Parties executed the *Amendment No. 2* to the *Secured Note*, whereby Diane and the Jonathan Parties, jointly and severally, promised to repay Plaintiff the $327,000 Loan no later than April 1, 2017.  [Ex. A at § 3.]

73.     As additional consideration for the Loan, Jonathan also agreed to take out a Life Insurance Policy for no less than $500,000 in coverage, with Plaintiff as the sole beneficiary. [*Id*. at § 8.6.]

74.     Diane personally guaranteed all obligations in the *Secured Note*.

75.     Diane and the Jonathan Parties materially breached the *Secured Note* by:

  a.   Failing to pay the outstanding $50,000 balance on the Secured Note prior to April 1, 2017, or any date thereafter;

  b.   Failing to take out a life insurance policy on Jonathan's in the amount of $500,000+ in coverage, with Plaintiff as sole beneficiary.

76.     As a direct and proximate result of the breaches of the *Secured Note*, Plaintiff has suffered damages, including the lost value of the $500,000 death benefit under the required life insurance policy.

77.     Consequently, Plaintiff is entitled to a consent judgment against Diane and the Jonathan Parties, jointly and severally, in a minimum amount of $550,000.  [*Id*. at § 11.]

78.     Plaintiff is also entitled to its reasonable attorney's fees and costs in this action. [*Id*. at § 12.2.]

WHEREFORE, Plaintiff demands judgment against Diane and the Jonathan Parties, jointly and severally, for damages, interests, costs, attorney's fees pursuant to § 12.2 of the *Secured Note*, and all other relief the Court deems just and proper.

**COUNT II**
**Foreclosure of Security Interest Under Secured Note**
(*against Diane and Jonathan*)

79.     Plaintiff repeats and realleges paragraphs 1 through 70 above as if fully set forth herein.

80.     This is an action to foreclose a security interest in Diane and Jonathan's personal property in Florida, namely promissory notes, securities (including any joint or individual securities accounts or brokerage accounts) or other investment properties, money, deposit accounts (including any joint or individual checking or savings accounts), other contractual rights or rights to payment of monies (including from the Jonathan Firms), and any and all furnishings, fixtures, equipment or personal property they own in their home located at 7483 Valencia Drive, Boca Raton, FL 33433 (collectively, "Diane Collateral").

81.     Diane and Jonathan failed to satisfy the terms of the *Secured Note*.  In particular, they defaulted on their payment obligations under the *Secured Note* by not paying the outstanding $50,000 balance to Plaintiff by April 1, 2018, or anytime thereafter.  They also defaulted on their obligation to purchase a $500,000 life insurance policy on Jonathan's life for the sole benefit of Plaintiff.

82.     The *Security Agreement* grants Plaintiffs a first priority security interest in the Diane Collateral set forth in Par. 80 until the *Secured Note* is paid in full. [*See* Ex. A at § 4; Ex. B. at §§ 2 and 16.]

83.     Pursuant to Section 679.2031, Florida Statutes, a security interest attached to the Diane Collateral no later than April 1, 2017, when Diane and Jonathan defaulted under the *Secured Note*, and Plaintiff became entitled to enforce the security interest against Diane and Jonathan with respect to the Diane Collateral.

18

84.     Pursuant to Section 679.2031(2), Florida Statutes, Plaintiff's security interest in the Diane Collateral is enforceable against Diane and Jonathan because (a) value has been given; (b) Diane and Jonathan have rights in the Diane Collateral or the power to transfer rights in the Diane Collateral to Plaintiff as secured party; and (c) Diane and Jonathan signed the *Secured Note* and *Security Agreement* that provides a description of the Diane Collateral.

85.     On November 12, 2014, Plaintiff perfected its security interest by filing a UCC Financing Statement with the State of Florida covering the Diane Collateral.  [*See* Ex. C.]

86.     Pursuant to Section 679.601, Florida Statutes, Plaintiff may foreclose on its security interest in the Diane Collateral.

WHEREFORE, Plaintiff demands that this Court enter judgment foreclosing on Plaintiff's security interest in the Diane Collateral and directing Diane and Jonathan to turn over immediate possession of the Diane Collateral to Plaintiff, and awarding interest, attorney's fees pursuant to § 12.2 of the *Secured Note*, costs, and all other relief the Court deems just and proper.

### COUNT III
### Breach of Perry Funding Agreement
### (*against the Perry Parties and John Doe Defendants*)

87.     Plaintiff repeats and realleges paragraphs 1 through 70 above as if fully set forth herein.

88.     On or about September 10, 2018, Plaintiff and the Perry Parties executed the *Perry Funding Agreement*, whereby the Perry Parties agreed to repay cash advances, plus accumulated use fee, provided to the Perry Firm pursuant to the specific formula described in Section 1 of the Agreement.  [Ex. G at § 1(a)-(c).]   Perry personally guaranteed the Perry Firm's payment obligations.  [*Id.* at p. 9.]

19

89.     The *Perry Funding Agreement* also prevented the Perry Parties from: encumbering the Collateral (as defined in the Agreement) with additional loans/debt; and transferring the Funded Cases away from the Perry Firm, or receiving case proceeds, without notifying Plaintiff.  [*Id*. at §§ 3(a)-(b).]

90.     Plaintiff performed its obligations under the *Perry Funding Agreement* by providing millions of dollars of mutually-agreed upon cash advances to the Perry Firm for thousands of case files.

91.     The Perry Firm materially breached the *Perry Funding Agreement* by:

   a.  failing to pay the Pre-Settlement cash advances, plus accumulated use fee, upon receipt of proceeds on Funded Cases, in violation of § 1(C)(i);

   b.  placing approximately 300+ cases into ligation, and closing out approximately 120+ cases, without repaying the Pre-Settlement cash advances, plus accumulated use fee, in violation of § 1(C)(ii);

   c.  failing to pay approximately $70,697 in Post-Settlement Funding that came due upon receipt of proceeds for those Funded Cases, in violation of § 1(C)(iii);

   d.  encumbering the Collateral by pledging its IOTA account as collateral for an unrelated, third-party loan from a loan shark, in violation of § 3(a);  and

   e.  transferring the Funded Cases in its Firm to the unknown John Doe Defendants without notifying Plaintiff, and failing to notify Plaintiff of receipt of case proceeds, both in violation of § 3(b).

92.     As a direct and proximate result of the Perry Parties' breaches of the *Perry Funding Agreement*, Plaintiff has suffered damages.

20

93.     Consequently, as of filing, Plaintiff is entitled to a consent judgment against the Perry Parties, jointly and severally, in the minimum amount of $2,234,280, plus accruing use fee. [*Id*. at §§ 4(v) and 6(g).]

94.     Plaintiff is also entitled to its reasonable attorney's fees and costs in this action. [*Id*. at § 6(d).]

95.     The John Doe Defendants are liable for the Perry Firm's breaches of the *Perry Funding Agreement* as the successor to, and/or mere continuation of, the Perry Firm.

WHEREFORE, Plaintiff demands judgment against Perry, the Perry Firm, and the John Doe Defendants, jointly and severally, for damages, interests, costs, attorney's fees pursuant to § 6(d) of the *Perry Funding Agreement*, and all other relief the Court deems just and proper.

**COUNT IV**
**Breach of Perry Guaranty Agreement**
(*against the Perry Parties and John Doe Defendants*)

96.     Plaintiff repeats and realleges paragraphs 1 through 70 above as if fully set forth herein.

97.     On or about April 15, 2019, the Perry Parties executed a *Guaranty Agreement* with Plaintiff, whereby the Perry Parties agreed to be responsible for the Jonathan Parties' contractual payment obligations to Plaintiff under the *Jonathan Funding Agreements*, in addition to the debt and obligations owed to Plaintiff under the *Perry Funding Agreement*.  [Ex. H at §§ 3(a), 5(a), and 16(f).]

98.     Plaintiff performed its obligations under the *Guaranty Agreement* by continuing to provide cash advance funding to the Perry Firm under the Perry Funding Agreement.

99.     As set forth in Pars. 40-41, 51-54, and 63-65, the Perry Parties defaulted on the *Perry Funding Agreement*, and the Jonathan Firms defaulted on each of the *Jonathan Funding Agreements*.

100.    As of filing, the total accelerated amount owed under the *Perry Funding Agreement* and *Jonathan Funding Agreements* is $9,129,260, plus accruing use fee.

101.    The Perry Firm materially breached the *Guaranty Agreement* by failing to pay the accelerated amount of $9,129,260, plus accruing use fee, in violation of §§ 3(a), 5(a), and 16(f).

102.    As a direct and proximate result of the Perry Parties' breaches of the *Guaranty Agreement*, Plaintiff has suffered damages.

103.    Consequently, Plaintiff is entitled to a consent judgment against the Perry Parties, jointly and severally, in the minimum amount of $9,129,260, plus accruing use fee.  [*Id*. at § 12(e).]

104.    Plaintiff is also entitled to its reasonable attorney's fees and costs in this action. [*Id*. at § 5(a).]

105.    The John Doe Defendants are liable for the Perry Firm's breaches of the *Guaranty Agreement* as the successor to, and/or mere continuation of, the Perry Firm.

WHEREFORE, Plaintiff demands judgment against Perry, the Perry Firm, and the John Doe Defendants, jointly and severally, for damages, interests, costs, attorney's fees pursuant to § 5(a) of the *Guaranty Agreement*, and all other relief the Court deems just and proper.

## COUNT V
## Breach of Main Funding Agreement
### (against the Jonathan Firms and John Doe Defendants)

106.    Plaintiffs repeat and reallege paragraphs 1 through 70 above as if fully set forth herein.

107.    On or about June 1, 2016, Plaintiff and the Jonathan Firms executed the *Main Funding Agreement*, whereby the Jonathan Firms agreed to repay cash advances, plus accumulated use fee, provided to the Jonathan Firms pursuant to the specific formula described in Section 1 of the Agreement.  [Ex. D at § 1(a)-(c).]  The *Main Funding Agreement* also prevented the Jonathan Firms from: encumbering the Collateral (as defined in the Agreement) with additional loans/debt; and transferring the Funded Cases away from the Jonathan Firms, or receiving case proceeds, without notifying Plaintiff.  [*Id*. at §§ 3(a)-(b).]

108.    Plaintiff performed its obligations under the *Main Funding Agreement* by providing millions of dollars of mutually-agreed upon cash advances to the Jonathan Firms for thousands of case files.

109.    The Jonathan Firms materially breached the *Main Funding Agreement* by:

a.    failing to pay the Pre-Settlement cash advances, plus accumulated use fee, upon receipt of proceeds on Funded Cases, in violation of § 1(C)(i);

b.    placing approximately 980+ cases into ligation, and closing out approximately 1190+ cases, without repaying the Pre-Settlement cash advances, plus accumulated use fee, in violation of § 1(C)(ii);

c.    failing to pay approximately $14,147 in Post-Settlement Funding that came due upon receipt of proceeds for those Funded Cases, in violation of § 1(C)(iii);

d.    encumbering the Collateral by pledging their case proceeds as collateral for several merchant cash loans, in violation of § 3(a);  and

e.    transferring the Funded Cases in its Firms to the unknown John Doe Defendants without notifying Plaintiff, and failing to notify Plaintiff of receipt of case proceeds, both in violation of § 3(b).

23

110.     As a direct and proximate result of the Jonathan Firms' breaches of the *Main Funding Agreement*, Plaintiff has suffered damages.

111.     Consequently, as of filing, Plaintiff is entitled to a consent judgment against the Jonathan Firms, jointly and severally, in the minimum amount of $4,118,864, plus accruing use fee.  [*Id*. at §§ 4(v) and 6(f).]

112.     Plaintiff is also entitled to its reasonable attorney's fees and costs in this action. [*Id*. at § 6(d).]

113.     The John Doe Defendants are liable for the Jonathan Firms' breaches of the *Main Funding Agreement* as the successor to, and/or mere continuation of, the Jonathan Firms.

WHEREFORE, Plaintiff demands judgment against the Jonathan Firms and the John Doe Defendants, jointly and severally, for damages, interests, costs, attorney's fees pursuant to § 6(d) of the *Main Funding Agreement*, and all other relief the Court deems just and proper.

## COUNT VI
### Breach of General Expense Funding Agreement
### (*against the Jonathan DC Firm and John Doe Defendants*)

114.     Plaintiff repeats and realleges paragraphs 1 through 70 above as if fully set forth herein.

115.     On or about March 26, 2018, Plaintiff and the Jonathan DC Firm executed the *General Expense Agreement*, whereby the Jonathan DC Firm agreed to repay cash advances provided to the Jonathan DC Firm pursuant to the specific formula described in Section 1 of the Agreement.  [Ex. E at § 1(a)-(d).]  The *General Expense Agreement* also prevented the Jonathan DC Firm from: encumbering the Collateral (as defined in the Agreement) with additional loans/debt; and transferring the Funded Cases away from the Jonathan DC Firm, or receiving case proceeds, without notifying Plaintiff.  [*Id*. at §§ 4(a)-(b).]

24

116.     Plaintiff performed its obligations under the *General Expense Agreement* by providing millions of dollars of mutually-agreed upon cash advances to the Jonathan DC Firm for general expenses incurred in its case files.

117.     The Jonathan DC Firm materially breached the *General Expense Agreement* by:

a.     failing to pay approximately $102,000 in cash advances and accumulated use fee from proceeds received in Funded Cases under that Agreement, in violation of § 1(D)(i);

b.     encumbering the Collateral by pledging their case proceeds as collateral for several merchant cash loans, in violation of § 4(a);  and

c.     transferring the Funded Cases in its Firms to the unknown John Doe Defendants without notifying Plaintiff, and failing to notify Plaintiff of receipt of case proceeds, both in violation of § 4(b).

118.     As a direct and proximate result of the Jonathan DC Firm's breaches of the *General Expense Agreement*, Plaintiff has suffered damages.

119.     Consequently, as of filing, Plaintiff is entitled to a consent judgment against the Jonathan DC Firm in the minimum amount of $1,386,312, plus accruing use fee.  [*Id*. at § 5(v).]

120.     Plaintiff is also entitled to its reasonable attorney's fees and costs in this action. [*Id*. at § 8(d).]

121.     The John Doe Defendants are liable for the Jonathan DC Firm's breaches of the *General Expense Agreement* as the successor to, and/or mere continuation of, the Jonathan DC Firm.

WHEREFORE, Plaintiff demands judgment against the Jonathan DC Firm and the John Doe Defendants, jointly and severally, for damages, interests, costs, attorney's fees pursuant to § 8(d) of the *General Expense Agreement*, and all other relief the Court deems just and proper.

**COUNT VII**
**Breach of Medical Expense Funding Agreement**
(*against the Jonathan DC Firm and John Doe Defendants*)

122.    Plaintiff repeats and realleges paragraphs 1 through 70 above as if fully set forth herein.

123.    On or about May 11, 2018, Plaintiff and the Jonathan DC Firm executed the *Medical Expense Agreement*, whereby the Jonathan DC Firm agreed to repay cash advances provided to the Jonathan DC Firm pursuant to the specific formula described in Section 1 of the Agreement.  [Ex. F at § 1(a)-(d).]  The *Medical Expense Agreement* also prevented the Jonathan DC Firm from: encumbering the Collateral (as defined in the Agreement) with additional loans/debt; and transferring the Funded Cases away from the Jonathan DC Firm, or receiving case proceeds, without notifying Plaintiff.  [*Id*. at §§ 4(a)-(b).]

124.    Plaintiff performed its obligations under the *Medical Expense Agreement* by providing millions of dollars of mutually-agreed upon cash advances to the Jonathan DC Firm for medical expenses its personal injury clients incurred.

125.    The Jonathan DC Firm materially breached the *Medical Expense Agreement* by:

   a.    failing to pay approximately $91,000 in cash advances and accumulated use fee from proceeds received in Funded Cases under that Agreement, in violation of § 1(D)(i);

   b.    encumbering the Collateral by pledging their case proceeds as collateral for several merchant cash loans, in violation of § 4(a);  and

26

      c.   transferring the Funded Cases in its Firms to the unknown John Doe Defendants without notifying Plaintiff, and failing to notify Plaintiff of receipt of case proceeds, both in violation of § 4(b).

126.    As a direct and proximate result of the Jonathan DC Firm's breaches of the *Medical Expense Agreement*, Plaintiff has suffered damages.

127.    Consequently, as of filing, Plaintiff is entitled to a consent judgment against the Jonathan DC Firm in the minimum amount of $1,389,804, plus accruing use fee. [*Id*. at § 5(v).]

128.    Plaintiff is also entitled to its reasonable attorney's fees and costs in this action. [*Id*. at § 8(d).]

129.    The John Doe Defendants are liable for the Jonathan DC Firm's breaches of the *Medical Expense Agreement* as the successor to, and/or mere continuation of, the Jonathan DC Firm.

WHEREFORE, Plaintiff demands judgment against the Jonathan DC Firm and the John Doe Defendants, jointly and severally, for damages, interests, costs, attorney's fees pursuant to § 8(d) of the *Medical Expense Agreement*, and all other relief the Court deems just and proper.

## COUNT VIII
### Breach of Jonathan Guaranty Agreement
**(against the Jonathan Parties and John Doe Defendants)**

130.    Plaintiff repeats and realleges paragraphs 1 through 70 above as if fully set forth herein.

131.    On or about April 15, 2019, the Jonathan Parties executed a *Guaranty Agreement* with Plaintiff, whereby the Jonathan Parties agreed to be responsible for the Perry Parties' contractual payment obligations to Plaintiff under the *Perry Funding Agreement*, in addition to

the debt and obligations owed to Plaintiff under the *Jonathan Funding Agreements*. [Ex. I at §§ 3(a), 5(a), and 16(f).]

132.    Plaintiff performed its obligations under the *Guaranty Agreement* by continuing to provide cash advance funding to the Jonathan Firms under the *Jonathan Funding Agreements*.

133.    As set forth in Pars.. 40-41, 51-54, and 63-65, the Perry Parties defaulted on the *Perry Funding Agreement*, and the Jonathan Firms defaulted on each of the *Jonathan Funding Agreements*.

134.    As of filing, the total accelerated amount owed under the *Perry Funding Agreement* and *Jonathan Funding Agreements* is $9,129,260, plus accruing use fee.

135.    The Jonathan Parties materially breached the *Guaranty Agreement* by failing to pay the accelerated amount of $9,129,260, in violation of §§ 3(a), 5(a), and 16(f).

136.    As a direct and proximate result of the Jonathan Parties' breaches of the *Guaranty Agreement*, Plaintiff has suffered damages.

137.    Consequently, as of filing, Plaintiff is entitled to a consent judgment against the Jonathan Parties, jointly and severally, in the minimum amount of $9,129,260, plus accruing use fee. [*Id*. at § 12(e).]

138.    Plaintiff is also entitled to its reasonable attorney's fees and costs in this action. [*Id*. at § 5(a).]

139.    The John Doe Defendants are liable for the Jonathan Firms' breaches of the *Guaranty Agreement* as the successor to, and/or mere continuation of, the Perry Firm.

WHEREFORE, Plaintiff demands judgment against the Jonathan Parties and the John Doe Defendants, jointly and severally, for damages, interests, costs, attorney's fees pursuant to § 5(a) of the *Guaranty Agreement*, and all other relief the Court deems just and proper.

**COUNT IX**
**Breach of Contract**
(*against the Jonathan Firms and John Doe Defendants*)

140.    Plaintiff repeats and realleges paragraphs 1 through 70 above as if fully set forth herein.

141.    In or around 2013, Plaintiff and the Jonathan Firms entered into a valid oral agreement for Plaintiff to fund certain aspects of the general operations of the Firms, including employee payroll/health insurance and technology systems, payable on demand.

142.    In consideration for their agreement, since 2013 Plaintiff advanced approximately $2.808 million in payroll and $515,000 in health insurance benefits for the Jonathan Firms' employees to keep the office up and running, documented via hundreds of e-mails.   Only $68,000 has been repaid.

143.    The Jonathan Firms materially breached the parties' oral agreement by failing to repay the monies provided by Plaintiff for the Jonathan Firms' payroll and health insurance benefits, plus fee, despite Plaintiff's demand in June 2019.

144.    As a direct and proximate result of the Jonathan Firms' breaches of the parties' oral agreement, Plaintiff has suffered damages.

145.    The John Doe Defendants are liable for the Jonathan Firms' breaches of the oral agreement as the successor to, and/or mere continuation of, the Jonathan Firms.

WHEREFORE, Plaintiff demands judgment against the Jonathan Firms and the John Doe Defendants for damages, interest, costs, and all other relief the Court deems just and proper.

29

**COUNT X**
**Breach of Implied-in-Fact Contract**
(*against the Jonathan Firms and John Doe Defendants*)

146.    Plaintiff repeats and realleges paragraphs 1 through 70 above as if fully set forth herein.

147.    This is a claim for breach of an implied-in-fact contract and is brought in the alternative to Count IX.

148.    Plaintiff and the Jonathan Firms entered into an agreement of which some or all of the terms are inferred from the parties' conduct and the surrounding circumstances, including, *inter alia*, the parties' oral representations, Plaintiff advancing approximately $2.808 million in payroll and $515,000 in health insurance benefits for the Jonathan Firms' employees, the parties hundreds of e-mails documenting same, and the Jonathan Firms making periodic repayments on the monies advanced.

149.    Plaintiff's and the Jonathan Firms' assent are derived from these facts and circumstances, including the parties' course of dealing and performance.

150.    The Jonathan Firms materially breached the parties' implied agreement by failing to repay Plaintiff the approximate $2.74 million in payroll and $515,000 in health insurance benefits outstanding, plus use fee.

151.    Plaintiff has suffered damages as a direct and proximate result of material breaches of the parties' implied agreement.

WHEREFORE, Plaintiff demands judgment against the Jonathan Firms for damages, interest, costs, and all other relief the Court deems just and proper.

30

## COUNT XI
## Unjust Enrichment
### (*against the Jonathan Firms and John Doe Defendants*)

152.    Plaintiff repeats and realleges paragraphs 1 through 70 above as if fully set forth herein.

153.    This is an action for unjust enrichment and is pled in the alternative to Counts V-IX.

154.    Plaintiff conferred benefits on the Jonathan Firms through its receipt and continued possession of: $4,956,464 in cash advances from Plaintiff for use in their personal injury cases; approximately $3,255,000 in outstanding cash advances for payroll and employee health benefits; and approximately $107,000 in cash advances to pay off the Jonathan Firms' merchant cash loans.

155.    The Jonathan Firms had knowledge of these benefits conferred and voluntarily accepted and retained the benefits conferred.

156.    The circumstances render the Jonathan Firms' retention of the benefits inequitable unless the Jonathan Firms pay Plaintiff the value of the benefits conferred.

157.    The Jonathan Firms have been unjustly enriched at the expense of Plaintiff.

158.    Plaintiff is entitled to damages as a result of the Jonathan Firms' unjust enrichment.

159.    John Doe Defendants are liable for the Jonathan Firms' unjust enrichment as the successor to, and/or mere continuation of, the Jonathan Firms.

WHEREFORE, Plaintiffs demand judgment against the Jonathan Firms and John Doe Defendants for damages, interest, costs, and all other relief the Court deems just and proper.

## COUNT XII
## <u>Unjust Enrichment</u>
### (*against the Perry Firm and John Doe Defendants*)

160.    Plaintiff repeats and realleges paragraphs 1 through 70 above as if fully set forth herein.

161.    This is an action for unjust enrichment and is pled in the alternative to Counts III-IV.

162.    Plaintiff conferred benefits on the Perry Firm through its receipt and continued possession of: $2,167,520 in cash advances from Plaintiff for use in its personal injury cases; and approximately $53,000 in cash advances to pay off a third-party loan shark.

163.    The Perry Firm had knowledge of these benefits conferred and voluntarily accepted and retained the benefits conferred.

164.    The circumstances render the Perry Firm's retention of the benefits inequitable unless the Perry Firm pays Plaintiff the value of the benefits conferred.

165.    The Perry Firm has been unjustly enriched at the expense of Plaintiff.

166.    Plaintiff is entitled to damages as a result of the Perry Firm's unjust enrichment.

167.    John Doe Defendants are liable for the Perry Firm's unjust enrichment as the successor to, and/or mere continuation of, the Perry Firm.

WHEREFORE, Plaintiffs demand judgment against the Perry Firm and John Doe Defendants for damages, interest, costs, and all other relief the Court deems just and proper.


## COUNT XIII
## <u>Fraudulent Transfer</u>
### (*against the Resnicks and John Doe Defendants*)

168.    Plaintiff repeats and realleges paragraphs 1 through 70 above as if fully set forth herein.

169.    This is an action by Plaintiffs against the Resnicks and the John Doe Defendants for violation of the Florida Uniform Fraudulent Transfer Act under Fla. Stat. Ch. 726.

170.    After breaching their respective Funding Agreements with Plaintiffs, the Jonathan Firms and Perry Firm, acting through their owners, Jonathan and Perry, conveyed all of their assets, clients, and its entire business operations to the John Doe Defendants – believed to include the Law Office of Louis J. Glick.  The John Doe Defendants are the Jonathan Firms' and Perry Firm's successors-in-interest.

171.    The Resnicks, as transferors, made these transfers with the actual intent to hinder, delay, or defraud Plaintiff's claims against the Resnicks.  Their fraudulent intent can be inferred by:

a.      Jonathan was an insider, *i.e.*, he was on both sides of the transactions;

b.      Jonathan retained control and possession of the assets and clients of his former firms after the transfers;

c.      Before the transfers were made, the Resnicks knew that Plaintiff had claims against them to recover over $13.1 million; and

d.      The conveyances were not disclosed to, and concealed from Plaintiff.

172.    The Resnicks also made the transfers without receiving a reasonably equivalent value in exchange for the transfers; and they: (a) were engaged or were about to engage in a business or a transaction for which the remaining assets of the debtor were unreasonably small in relation to the business or transaction, or (b) intended to incur, or believed or reasonably should have believed that they would incur, debts beyond their ability to pay as they became due.  In particular, the client files conveyed were the only assets owned by the law firms at the time of

33

the conveyance that generated revenue and that could have been applicable to the payment of damages to Plaintiff.

173.    The John Doe Defendants, as transferee, participated in, accepted, and had knowledge of the fact that the Resnicks were transferring their law firms' assets, clients, and business operations to the John Doe Defendants with the intent to defraud, among others, Plaintiff.

174.    The primary purpose of the Resnicks transferring their law firms' assets, clients and business operations to the John Doe Defendants was to make themselves judgment proof.

175.    Plaintiff was an existing and known creditor of the Resnicks when they transferred their law firms' assets, clients and business operations to the John Doe Defendants.

176.    As a result of the fraudulent transfers of the Jonathan Firms' and Perry Firm's assets and clients, those assets were dissipated by the Jonathan Firms and Perry Firm without paying the sums due and owing to Plaintiff, and the Jonathan Firms and Perry Firm ultimately became insolvent.  Plaintiff has, therefore, been damaged.

WHEREFORE, Plaintiff demands judgment that avoids the transfer of any assets and clients from the Jonathan Firms and Perry Firm assets to the John Does Defendants and awards damages, costs, and interest against Defendants and any other relief that the Court deems just.

**MORGAN & MORGAN, P.A.**
**Business Trial Group**

*/s/Evan H. Frederick*
**Evan H. Frederick**
Florida Bar No. 064819
**William B. Lewis**
Florida Bar No. 064936
515 N Flagler Street, Suite 2125
West Palm Beach, Florida 33401
Telephone: (561) 227-5858
Facsimile: (561) 227-5859
EFrederick@forthepeople.com
WLewis@forthepeople.com

*Attorneys for Plaintiffs*